HARRISON SUPPLY CO. v. UNITED STATES.

(Circuit Court, D. Massachusetts. July 27, 1908.)

No. 110 (1,756).

1. CUSTOMS DUTIES—CLASSIFICATION—"IRON SAND"—"IRON MANUFACTURED."

So-called "iron sand," a completed article produced by a series of manufacturing processes from cast iron and steel scrap, is not within the provision for "all iron in * * * forms less finished than iron in bars, and more advanced than pig iron," in Tariff Act July 24, 1897, c. 11, § 1, Schedule C, par. 124, 30 Stat. 159 (U. S. Comp. St. 1901, p. 1636), but is dutiable as "iron manufactured," under paragraph 193, 30 Stat. 167 (U. S. Comp. St. 1901, p. 1645).

2. SAME—"UNWROUGHT METALS."

Iron sand, a completed article manufactured from cast iron and steel scrap, is not dutiable as "unwrought metals," under Tariff Act July 24, 1897, c. 11, § 1, Schedule C, par. 183, 30 Stat. 166 (U. S. Comp. St. 1901, p. 1645).

[Ed. Note.—For other definitions, see Words and Phrases, vol. 8, p. 7221.

Interpretation of commercial and trade terms in tariff laws, see note to Dennison Mfg. Co. v. United States, 18 C. C. A. 545.]

On Application for Review of a Decision by the Board of United States General Appraisers.

Searle & Pillsbury and Hatch & Clute (Walter F. Welch, of counsel), for importers.

William H. Garland, Asst. U. S. Atty.

LOWELL, Circuit Judge. This was an importation of material variously called "iron sand," "iron shot," "iron grit," "steel shot," or "diamond steel." It is used for sawing and polishing granite and stone, and for like purposes. The method of its manufacture is thus described by the manufacturer:

"It is manufactured by melting together in a furnace a mixture of cast iron and steel scrap, which, while in the furnace, is decarburetted by the action of an air blast, thereby converting it into steel of about 1.55 per cent. carbon. The liquid steel is then allowed to flow out of the furnace onto a stream jet, which scatters it in a shower of particles of various sizes into a pond of cold water. The water is then run off, and the particles of steel are collected, dried, and separated into the various grades by passing them through riddles or sieves. The material is then put up in bags and labeled according to the various grades, which range from about the size of buckshot down to fine dust."

Notwithstanding this statement, it is admitted that the material is chemically iron, and not steel; the proportion of carbon being not less than 2.33 per cent., a percentage too high for steel.

By proper protest the importers set up that the importation was dutiable under paragraph 124 of the Dingley tariff act (Act July 24, 1897, c. 11, § 1, Schedule C, 30 Stat. 159 [U. S. Comp. St. 1901, p. 1636]), or, in the alternative, under paragraph 183. The Board of General Appraisers affirmed the decision of the collector, holding the importation dutiable under paragraph 193. The material parts of these paragraphs read as follows:

Paragraph 124: "Provided, that all iron in slabs, blooms, loops, of other forms less finished than iron in bars, and more advanced than pig iron, except castings, shall be subject to a duty of five-tenths of one cent per pound." 30 Stat. 159.

Paragraph 183: "Metallic mineral substances in a crude state, and metals unwrought, not specially provided for in this act, twenty per cent. ad valorem; monazite sand and thorite, six cents per pound." 30 Stat. 166.

Paragraph 193: "Articles or wares, not specially provided for in this act, composed wholly or in part of iron, steel, lead, copper, nickel, pewter, zinc, gold, silver, platinum, aluminum or other metal, and whether partly or wholly manufactured, forty-five per centum ad valorem." 30 Stat. 167.

For earlier statutes, see 22 Stat. 497; 26 Stat. 574; 28 Stat. 515. The merchandise in question is not specifically described in any paragraph of the Dingley act. Its classification must be sought in the more general language of the tariff. If it can fairly be brought within the iron schedule, it belongs there, being iron unmixed with any other metal. This consideration points to paragraph 124, as paragraphs 183 and 193 are both outside the iron schedule; but it is hard to find a place for the importation within that schedule. The first paragraphs of the schedule begin with iron in its earliest state, and proceed with increasing duties through the stages of manufacture. Thus paragraph 121 deals with iron ore, dutiable at $1 a ton; paragraph 122 with pig iron, etc., dutiable at $4 a ton; paragraph 123 with bar iron, etc., dutiable at $12 a ton; paragraph 124 with round iron, etc., dutiable at $16 a ton. Paragraph 124, however, has ill-arranged provisos harking back to earlier stages of manufacture, and imposing duties of $10 and $12 a ton. Two of the importer's witnesses, Little and Billings, whose evidence was not before the Board of General Appraisers, testified that the importation was "more advanced than pig iron" and "less finished than iron in bars." This testimony does not impress me strongly. Little twice denied that the material was more advanced than pig iron (interrogatories 12, 13), though he asserted the contrary immediately afterwards (interrogatories 17, 22). He had never seen the material. Billings was so little informed concerning it that he called it an alloy. The government introduced no testimony to meet this inconclusive evidence; but even if the importation be capable of classification with reference to pig iron and bar iron, its price and the nature of its manufacture appear to put it not lower in the scale of development than the latter. I agree, however, with the Board of General Appraisers that the importation cannot be treated as comparable with iron ore, pig iron, bar iron, round iron, etc., in

the advancing manufacture of iron. It is rather a separate manufacture, aside from the ordinary line of development. Paragraph 183 is out of the question, and the decision of the Board of General Appraisers holding the importation dutiable under paragraph 193 is affirmed.